**Emiliano Michael DE CONTRERAS, An Individual, et al., Plaintiffs,**

v.

**CITY OF RIALTO, A Municipal Corporation, et al., Defendants.**

**Case No. EDCV 11–01425 VAP.**

United States District Court, C.D. California.

Sept. 25, 2012.

Elena C. Correa, Law Office of Elena C. Correa, Ontario, CA, for Plaintiffs.

Jon Farrell Hamilton, Kimberly Anne Wah, Ferguson Praet and Sherman, Santa Ana, CA, Risa Su Christensen, Wagner and Pelayes LLP, Riverside, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART AND DISMISSING PLAINTIFFS' REMAINING CLAIMS

VIRGINIA A. PHILLIPS, District Judge.

The Court has received and considered all Defendants' papers filed in support of their Motion for Summary Judgment and Plaintiffs' evidentiary objections to Defendants' Motion for Summary Judgment. A hearing on this matter took place on September 10, 2012. Both parties' counsel submitted on the Court's tentative order without oral argument.

## I. BACKGROUND

Plaintiffs Vanessa Morales, Raquel Padilla, Emiliano Michael De Contreras, and Mario Diaz filed a complaint on September 7, 2011 (Doc. No. 1) and an amended complaint on November 4, 2011 (Doc. No. 17), both of which alleged claims for civil rights violations under 42 U.S.C. § 1983, violations of the Americans with Disabilities Act ("ADA"), assault, battery, intentional infliction of emotional distress, negligent supervision and hiring, negligence, and abuse of process. The Court granted Defendants' unopposed motion to dismiss, with leave to amend, on December 27, 2011 (Doc. No. 25). Plaintiffs filed their Second Amended Complaint on January 17, 2012 (Doc. No. 26), and their Third Amended Complaint ("TAC") on February 10, 2012, which named as Defendants City of Rialto, Officers Michael Mastaler, William Wilson, Michael Lee, and Scott Chilton (all in their individual and official ca-

pacities), Mark King (in his individual and official capacity), County of San Bernardino ("the County"), San Bernardino County Sheriff's Department, San Bernardino District Attorney's Office ("the DA's Office"), West Valley Detention Center ("WVDC"), Arrowhead Regional Medical Center ("ARMC"), and Does 1 through 10. (Doc. No. 33.) In their TAC, Plaintiffs asserted the following claims:

1. Municipal Liability under 42 U.S.C. § 1983 against the City, County, King, and "Does 6–10" ("First Claim");

2. Violation of De Contreras's Fourth Amendment Rights brought under 42 U.S.C. § 1983 against King, Officers Mastaler, Wilson, Lee, and Chilton, and "Does 1–5" ("Second Claim");

3. Violation of De Contreras's Fourteenth Amendment Rights brought under 42 U.S.C. § 1983 against King, Officers Mastaler, Wilson, Lee, and Chilton, and "Does 1–5" ("Third Claim");

4. Violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12100, *et seq.,* against the City, County, and "Does 6–10" ("Fourth Claim");[1]

5. Assault, against Officers Mastaler, Wilson, Lee, and Chilton, and "Does 1–5" ("Fifth Claim");

6. Battery, against Officers Mastaler, Wilson, Lee, and Chilton, and "Does 1–5" ("Sixth Claim");

7. Intentional Infliction of Emotional Distress ("IIED"), against Officers Mastaler, Wilson, Lee, and Chilton, and "Does 1–5" ("Seventh Claim");

8. Negligent Supervision and Hiring, against the City and County ("Eighth Claim");

9. Negligence, against all Defendants ("Ninth Claim"); and

10. Abuse of Process, against all Defendants ("Tenth Claim").

On April 9, 2012, the Court granted, with leave to amend, the motion to dismiss Plaintiffs' first, fourth, eighth, ninth, and tenth claims against the County, the Sheriff's Department, the DA's Office, WVDC, and ARMC. (Doc. No. 42.)

On April 16, 2012, Plaintiffs filed their Fourth Amended Complaint ("FAC") against the same Defendants (Doc. No. 48); on April 25, Plaintiffs stipulated to dismiss from the FAC all claims against the DA's Office, ARMC, and the County, except those against the Sheriff's Department for its operations of WVDC. (Doc. No. 51.) Since then, Plaintiffs, except for De Conteras, stipulated to dismiss their fourth and fifth claims as against the County (June 18, 2012 Stipulation (Doc. No. 62)), and De Contreras stipulated to dismiss all claims against the County, its Sheriff's Department, and WVDC (September 6, 2012 Stipulation (Doc. No. 105)). All Plaintiffs, including De Contreras, have stipulated to dismiss from the FAC Defendants Mark Kling[2] and the Rialto Police Department (July 17, 2012 Stipulation (Doc. No. 69)); their second claim as to Mastaler (July 17, 2012 Stipulation (Doc. No. 70)); their sixth, seventh, and eighth claims as to all Defendants (July 18, 2012 Stipulation (Doc. No. 71)); their second and third claims as to Chilton and Wilson (July 18, 2012 Stipulations (Doc. Nos. 72, 73)); their tenth claim as to Chilton and Lee (August 8 and 9, 2012 Stipulations

---

1. Although Plaintiffs captioned their fourth claim as *against the City,* County, and Does 6–10 only, their claim includes all Defendants who moved to dismiss. (*See* TAC ¶ 64.)

2. Mark Kling was erroneously identified in the FAC as "Mark King."

(Doc. Nos. 85, 87)); and their first claim as to all Defendants (August 9, 2012 Stipulation (Doc. No. 86)).

On August 13, 2012, the remaining Defendants moved for summary judgment (Doc. No. 88, re-filed August 23 at Doc. No. 99) on the remaining FAC claims, summarized below:

1. De Contreras's
   a. Fourth Amendment claim against Lee for excessive force;
   b. Fourteenth Amendment claim against Lee and Mastaler for fabricating police reports;
   c. state law claim for abuse of process against the City, Wilson, and Mastaler; and
2. All plaintiffs'
   a. Rehabilitation Act claim against the City;
   b. ADA claim against the City;
   c. negligent supervision and hiring claim against the City; and
   d. general negligence claims against the City, Wilson, and Mastaler.

Along with its Motion for Summary Judgment ("MSJ"), Defendants filed a declaration of Jon F. Hamilton (Doc. No. 99–6) attaching Exhibits A–Y (Doc. Nos. 99–2, 3, 4) and a Statement of Undisputed Facts ("SUF" (Doc. No. 99–7)). On August 20, the deadline for filing an opposition, Plaintiffs filed their Objection to Evidence (Doc. No. 96) and no other documents. Defendants replied on August 27. (Doc. No. 102.)

## II. LEGAL STANDARD

A motion for summary judgment shall be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

Generally, the burden is on the moving party to demonstrate that it is entitled to summary judgment. *Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir.1998); *Retail Clerks Union Local 648 v. Hub Pharmacy, Inc.*, 707 F.2d 1030, 1033 (9th Cir.1983). The moving party bears the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

When the non-moving party has the burden at trial, however, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. Instead, the moving party's burden is met by pointing out there is an absence of evidence supporting the non-moving party's case. *Id.*

The burden then shifts to the non-moving party to show that there is a genuine issue of material fact that must be resolved at trial. Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. The non-moving party must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *see also* William W. Schwarzer, A. Wallace Tashima & James M. Wagstaffe, *Federal Civil Procedure Before Trial*, 14:144. "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir.2010) (citing *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505). "The non-moving party must do more than show there is

some 'metaphysical doubt' as to the material facts at issue." *In re Oracle,* 627 F.3d at 387 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In ruling on a motion for summary judgment, the Court construes the evidence in the light most favorable to the non-moving party. *Barlow v. Ground,* 943 F.2d 1132, 1135 (9th Cir. 1991); *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987).

## III. FACTS

### A. Preliminary Matters

#### 1. Evidentiary Objections

■ Plaintiffs' counsel, Elena C. Correa, electronically filed Plaintiffs' objections to Defendants' MSJ evidence. Correa did not sign the document, either by hand or electronically, nor did she submit a mandatory chambers copy of the document. Thus, the document Correa submits is in violation of (1) Federal Rule of Civil Procedure 11(a) ("Every pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name . . . ."); (2) Local Rule 5–4.3.4 (requiring electronically filed documents to be signed and listing the acceptable forms of signature); (3) Local Rule 5–4.5 (requiring delivery to chambers of a duplicate in paper format of all electronically filed documents); (4) Court's Standing Order ¶ 7 (Doc. No. 4) (requiring the same); and (5) Local Rule 11–1 (requiring counsel's signature on all documents except for declarations).

Plaintiffs object on hearsay grounds to the declarations of Rialto Police Corporal John Black (Ex. C); Rialto Police Sergeant Christopher Hice (Ex. K); former Rialto Jailer Libni Cerdenio (Ex. M); Physicians Assistant Thomas Manning (Ex. N); Rialto Chief of Police William "Tony" Farrar (Ex. T); former Rialto Police Officer Michael Lee (Ex. W); and Rialto Police Officer Michael Mastaler (Ex. X). Plaintiffs also object to the following documentary evidence: Taser Information Data (Ex. L); Police Report and Supplemental Report (Ex. P); and the Transcript of 911 Call (Ex. Q).

■ Even if Correa had submitted Plaintiffs' objections without the numerous deficiencies described above, the Court nevertheless would overrule them. Plaintiffs, instead of identifying the objected-to portions of the declarations, provide the page range for the entire exhibit (or inaccurate pages that do not match the objection).[3] Objections based on hearsay are particularly context-specific, and "[t]he Court is not inclined to comb through these documents, identify potential hearsay, and determine if any exception applies—all without guidance from the parties." *Clearman v. Fernando,* No. 05–5633–AG, 2010 WL 431901 (C.D.Cal. Jan. 31, 2010), *aff'd,* 471 Fed.Appx. 586 (9th Cir.2012) (quoting *Burch v. Regents of Univ. of Cal.,* 433 F.Supp.2d 1110, 1124 (E.D.Cal.2006)).

Plaintiffs' objections submitted by Correa are utterly inadequate in procedure, form, and substance, and are thus overruled.

#### 2. Plaintiffs' Failure to Oppose Defendants' MSJ

"Any party who opposes [a motion for summary judgment] shall serve and file with the opposing papers a separate document containing a concise 'Statement of

---

**3.** Plaintiffs, for example, object to Exhibits C and T, but cite to pages outside those exhibits.

Genuine Disputes' setting forth all material facts as to which it is contended there exists a genuine dispute necessary to be litigated." Local R. 56–1. Where, as here, a party fails to submit opposing papers or evidence, the Court "may assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy." Local. R. 56–3; *see also* Fed.R.Civ.P. 56(e) ("If a party ... fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: ... (2) consider the fact undisputed for the purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it...."). Thus, without an opposition or evidence from Plaintiffs, the Court applies standards consistent with Federal Rule of Civil Procedure 56 and determines whether Defendants' evidence demonstrates that there is no genuine issue of material fact and that Defendants are entitled to judgment as a matter of law. *See Henry v. Gill Indus., Inc.,* 983 F.2d 943, 949–50 (9th Cir.1993).

### B. Defendants' Facts and Evidence

On August 14, 2010, at approximately 11:01 p.m., 13–year–old M.M. called 9–1–1 and reported to the Rialto Police Department that two men were fighting at 200 S. Linden Ave, Apt. 12T, and that one man, who M.M. identified as "Emiliano," had a knife. (SUF ¶¶ 1, 2; Ex. B at 21–22 (M.M. Dep.).) Officers Michael Lee and Michael Mastaler responded to M.M.'s call and, at approximately 11:08 p.m., were approaching the apartment as they heard M.M. call out for them to "hurry." (SUF ¶¶ 3, 4, Ex. B at 17.)

The officers knocked on the door to apartment 12T and announced themselves as police officers, at which time they heard yelling and banging from inside the apartment. (SUF ¶¶ 5, 6.) Lee went around to the side of the apartment, jumping over a wall to gain access to an open sliding glass door. (SUF ¶ 7.) Roughly five to ten seconds after knocking, Mastaler broke down the front door and entered at the same time that Lee entered from the side door; both officers had their firearms drawn as they entered the apartment.[4] (SUF ¶¶ 8, 9; Ex. D. at 28–29 (Lee Dep.); Ex. E. at 57, 58 (Mastaler Dep.).) Once inside the apartment, the officers immediately saw two Hispanic men—Emiliano De Contreras and Mario Diaz—"fighting" and "holding on to each other" (SUF ¶ 10; Ex. D at 30), and Mastaler immediately saw two women, Vanessa Morales and Raquel Padilla (Ex. E at 58). One man, De Contreras, was shirtless, and the officers recognized his tattoos as "gang tattoos." (*Id.*; SUF ¶ 20.)

The officers perceived that, within seconds of their entry, De Contreras and Diaz recognized them as police officers. (SUF ¶ 11.) Defendants' SUF describes the following events, some of which are contradicted by Defendants' submitted evidence, as described below. "Upon seeing the officers in the apartment, Diaz immediately put his hands up and did not move" (SUF ¶ 13; *see also* Ex. G at 92 (Diaz Dep.)), at which point the officers yelled "commands for the males to get to the ground." (SUF ¶ 15.) Lee, observing that De Contreras was not holding a knife, holstered his firearm and drew his taser. (SUF ¶ 16.) According to Lee, "De Contreras then, with his hands jerking from the side of his head forward, took an aggressive step towards

---

**4.** According to Mastaler's deposition, he drew his firearm after he entered the apartment

and observed the men fighting. (Ex. E at 57.)

the officers" and yelled "shoot me m*****r f*****r," at which point Lee fired his taser, the darts striking De Contreras's chest and "incapacitating [him] momentarily." (SUF ¶¶ 17, 21, 22; Ex. D at 33.)

Defendants' submitted evidence describes these events with some variation: According to Lee and Mastaler, Diaz "dropped to the ground" and became compliant as soon as he recognized the officers' presence. (Ex. D. at 32; Ex. E at 57.) According to Diaz, both he and De Contreras ceased fighting, "quickly stopped in our place" and "just stood there." (Ex. G at 92.) According to De Contreras, Diaz "sat on the couch and put his hands up" while both De Contreras and Diaz tried to tell the officers that they were deaf. (Ex. F at 81 (De Contreras Dep.).) Lee recounts that De Contreras "moved to the middle of the room" and "then approached" the officers, with his hands positioned "as if [he were] ready to fight." (Ex. D at 33.) Mastaler states that De Contreras "stood up" and then "rushed" him. (Ex. E. at 57.) Both Lee and Mastaler recall that De Contreras advanced towards them and that Mastaler pushed De Contreras away, which is when Lee switched from his firearm to his taser and ordered De Contreras to get on the ground. (Ex. D. at 34–35; Ex. E at 57–58.) De Contreras did not comply and, at 11:16 p.m., Lee fired his taser at De Contreras. (Ex. E at 63.; Ex. K 912 (Hice Decl.).)

The following facts regarding what occurred after Lee first fired his taser and approximate time measurements are established by the video recording from Lee's taser. (*See* Ex. J (Video Recording from Officer Lee's Taser) (filed manually).)[5] Second 1: The taser darts strike De Contreras in the chest; he falls first to his knees and then collapses face-down on the floor. Seconds 2–7: He begins to roll to his side and jerks his knees towards his chest; his left arm extends into the air. Seconds 8–12: He rolls on to his back briefly and then rolls to his right side. His arms are moving, but they mostly are blocked from view as his back is to the taser camera. Seconds 13–22: He rolls face down with his left side slightly up, supported by his right forearm. Both arms are bent at the elbow and tucked under his chest. Seconds 23–26: He is face down, lying flat except for his arms tucked under his chest. Seconds 27–32: He starts to roll over on to his right side; his arms move up and down several times; his mouth is open. Second 33: From this point on, it appears from the camera angle that Lee is standing almost directly over De Contreras. Seconds 33–38: Image is blurry; De Contreras appears to be rolled over on his right side and continues moving. Seconds 39–41: He rolls back face-down so his back is to the camera. Second 42:[6] He rolls on to his back. Seconds 43–46: Image is blurry; camera appears to be moving. Second 47: He is lying flat, face-down, only part of his body is visible on camera. (Video recording ends).

According to Mastaler, while on the ground after the first tasing, De Contreras "was struggling and moving and making some type of noise" (Ex. E at 64); Lee believed that De Contreras was trying to extricate the taser darts from his chest (SUF ¶ 24). Neither Lee nor Mastaler,

---

**5.** The video file on the disk submitted by Defendants as Exhibit J does not appear to have audio as intended by Defendants. (*See* Ex. K 91 4.) The Court relies on Defendants' other submitted evidence to establish the sounds during the duration of the video recording.

**6.** According to the times recorded by Lee's taser (model X26), it is around second 42 that Lee deploys the second charge. (*See* Ex. L (Taser Information Data).)

whose attention was focused on the three other adults in the room (SUF ¶ 22), attempted to handcuff De Contreras while he was on the ground after being initially tased (Ex. E at 68–69). Lee ordered De Contreras to lay down on his stomach. (SUF ¶ 23; Ex. E at 68–69.) Forty-two seconds after Lee first fired his taser at De Contreras, Lee discharged a second cycle of electricity into De Contreras's chest. (SUF ¶ 28; Ex. K ¶ 3.) Lee discharged the taser both times for five-second cycles. (Ex. L (Taser Information Data).) According to Mastaler, Lee then placed De Contreras in handcuffs while Mastaler held his firearm and provided cover. (Ex. E at 70.) Lee does not remember placing De Contreras in handcuffs. (Ex. D at 36.) After De Contreras was handcuffed, Mastaler told Lee that the four adult occupants of the apartment were deaf, a fact he learned from 13–year-old M.M., who at some point had entered the room. (SUF ¶¶ 31, 32; Ex. D at 37.) According to Lee, before De Contreras was tased and handcuffed, "[t]here was nothing to indicate anyone there was deaf." (Ex. D at 37; *see also* Ex. F at 83 (De Contreras Dep.) ("[The officers] didn't know we are deaf.").)

After De Contreras was handcuffed, one of the officers "put [Diaz] on the floor, face down[,]" handcuffed him, and then sat him up on the couch while the officers "dragged [De Contreras] out" of the apartment (Ex. G at 93–94) and placed him in the back of Lee's patrol car (SUF ¶ 37). At 11:30 p.m., Lee began driving De Contreras from the apartment to the Rialto Police Station, where they arrived at 11:36 p.m. (SUF ¶¶ 37, 39.) Lee does not recall who decided De Contreras should be taken to the police station first instead of the hospital, nor does he remember how he ascertained De Contreras's identification information. (Ex. D at 38–39.) Mastaler, meanwhile, remained in the apartment, interviewing Morales and Padilla with M.M.

serving as a sign-language translator. (SUF ¶ 54.) Sometime during Mastaler's investigation, Sergeant Scott Chilton, the shift supervisor, arrived, assessed the situation, and told Mastaler to contact him if Mastaler had difficulty communicating with the witnesses. (SUF ¶ 60.) Mastaler concluded his investigation, removed Diaz's handcuffs, left the apartment, and began driving back to the police station at 11:53 p.m. (SUF ¶ 57; Ex. C 91 4 (Black Decl.).)

While at the police station, De Contreras communicated that he was in pain; he was taken to the hospital at 11:54 p.m. and was seen by a doctor at 12:10 a.m. (SUF ¶¶ 42, 43, 45.)

Mastaler, based on M.M.'s translation of Morales and Padilla's statements, prepared the incident report and narrative, which Lieutenant Wilson reviewed two days later. (SUF ¶¶ 63–65.) Lee then prepared a supplemental report, which Chilton reviewed. (SUF ¶ 66.)

## IV. DISCUSSION

Defendants' asserted facts and supporting evidence, while at times conflicting as to non-material facts, are sufficient for the Court, lacking the benefit of any evidence or argument submitted by Plaintiffs, to find there is no triable issue of material fact as to any of Plaintiffs' claims. The Court considers below whether the undisputed facts entitle Defendants to judgment as a matter of law on each of Plaintiffs' claims.

## A. De Contreras's Fourth Amendment Claim Against Officer Lee

### 1. Excessive Force Standard

In Fourth Amendment excessive force actions brought under 42 U.S.C. § 1983, the two primary inquiries posed by a motion for summary judgment are (1)

whether there was a constitutional violation (i.e., whether the uncontroverted evidence could reasonably be found to show that the officer's use of force was unreasonable); and (2) whether the officer is entitled to qualified immunity (i.e., whether the plaintiff's allegedly violated right was clearly established at the time of the injury). *See Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (overruling the mandate in *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), that courts address the constitutional question first, and holding that trial courts may address either inquiry first and may grant a defendant's summary judgment motion solely on qualified immunity grounds without reaching the constitutional question).[7] Summary judgment motions in excessive force actions require courts to "slosh [their] way through the factbound morass of 'reasonableness'" (*Scott v. Harris,* 550 U.S. 372, 383, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)); hence, the Ninth Circuit has stated that courts should grant summary judgment in excessive force cases sparingly. *See Santos v. Gates,* 287 F.3d 846, 853 (9th Cir.2002) ("Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly."); *Alexander v. Cnty. of Los Angeles,* 64 F.3d 1315, 1322 (9th Cir.1995) (stating that in most excessive force cases, the question of reasonableness "is normally a jury question").

The Fourth Amendment's prohibition of excessive force is premised on the notion that "bodily integrity [is] 'a cherished value in our society.'" *United States v. Kriesel,* 508 F.3d 941, 948 (9th Cir.2007) (quoting *Schmerber v. California,* 384 U.S. 757, 772, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)). "A claim against law enforcement officers for excessive force is analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Arpin v. Santa Clara Valley Trans. Agency,* 261 F.3d 912, 921 (9th Cir.2001) (citing *Graham v. Connor,* 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). "The Fourth Amendment requires police officers making an arrest to use only an amount of force that is objectively reasonable in light of the circumstances" as perceived by a reasonable officer at the scene. *Blankenhorn v. City of Orange,* 485 F.3d 463, 477 (9th Cir.2007) (citing *Tennessee v. Garner,* 471 U.S. 1, 7–8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)); *Graham,* 490 U.S. at 396–97, 109 S.Ct. 1865. Courts determine whether the use of force was objectively reasonable through "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865.

With respect to the Fourth Amendment intrusion side of the balance, courts must "assess the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force inflicted." *Miller v. Clark Cnty.,* 340 F.3d 959, 964 (9th Cir.2003). With respect to the countervailing government interest side of the balance, courts

---

7. The Ninth Circuit, in an excessive force case involving police tasers, expressed a preference to "follow the *Saucier* order ... because this 'two-step procedure promotes the development of constitutional precedent' in an area where this court's guidance is sorely needed." *Mattos v. Agarano,* 661 F.3d 433, 440 (9th Cir.2011) (en banc), *cert. denied,* —— U.S. ——, 132 S.Ct. 2681, 183 L.Ed.2d 62 (2012) (quoting *Pearson,* 555 U.S. at 236, 129 S.Ct. 808.)

must consider the three factors established in *Graham:* (1) the severity of the suspect's alleged crime; (2) the threat posed by the suspect to the officers and the public; and (3) whether the suspect was actively resisting or evading arrest. 490 U.S. at 396, 109 S.Ct. 1865. " 'These factors, however, are not exclusive. Rather, [courts] examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham.*'" *Mattos,* 661 F.3d at 441 [8] (quoting *Bryan v. MacPherson,* 630 F.3d 805, 826 (9th Cir.2010) (internal quotation marks omitted)). *See, e.g., Deorle v. Rutherford,* 272 F.3d 1272, 1283 (9th Cir.2001) (requiring courts to account for the fact that a plaintiff is "emotionally disturbed" in their *Graham* balancing); *Chew v. Gates,* 27 F.3d 1432, 1440 n. 5 (9th Cir.1994) (listing the following additional factors a court may consider: "whether a warrant was used, whether the plaintiff resisted or was armed," the number of suspects or officers involved, whether the plaintiff was sober, "the availability of alternative methods" of effecting the arrest, "the nature of the arrest charges," and "whether other dangerous or exigent circumstances existed at the time of the arrest"); *Headwaters Forest Defense v. Cnty. of Humboldt,* 240 F.3d 1185, 1204 (9th Cir.2000), vacated on other grounds, 534 U.S. 801, 122 S.Ct. 24, 151 L.Ed.2d 1 (2001) ("[P]olice are required to consider what other tactics if any were available to effect the arrest.").

In the Ninth Circuit, "threat" is "the most important single element of the three specific *[Graham]* factors." *Chew,* 27 F.3d at 1441. "A simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Bryan,* 630 F.3d at 826 (citation and internal quotations omitted). When the circumstances show that a reasonable officer would not perceive the need for force, "any force used is constitutionally unreasonable." *Sanders v. City of Fresno* 551 F.Supp.2d 1149, 1166 (E.D.Cal.2008), *aff'd,* 340 Fed.Appx. 377 (9th Cir.2009) (citing *Fontana v. Haskin,* 262 F.3d 871, 880 (9th Cir.2001)); *Motley v. Parks,* 432 F.3d 1072, 1089 (9th Cir. 2005).

In *Bryan,* the Ninth Circuit considered the reasonableness of the same use of force at issue here: a model X26 taser deployed in dart mode.[9] *(See* Ex. L.)

The X26 uses compressed nitrogen to propel a pair of 'probes'—aluminum darts tipped with stainless steel barbs connected to the X26 by insulated wires—toward the target at a rate of over 160 feet per second. Upon striking a person, the X26 delivers a 1200 volt, low ampere electrical charge through the wires and probes and into his muscles. The impact is as powerful as it is

---

**8.** Because the Ninth Circuit consolidated its en banc rehearings of *Brooks v. City of Seattle,* 599 F.3d 1018 (9th Cir.2010), and *Mattos v. Agarano,* 590 F.3d 1082 (9th Cir.2010), the en banc rehearings for both cases are referred to by the citation *Mattos v. Agarano,* 661 F.3d 433 (2011) (en banc).

**9.** Tasers can be deployed in either dart mode or drive-stun mode. "When a taser is used in drive-stun mode, the operator removes the dart cartridge and pushes two electrode contacts located on the front of the taser directly

against the victim. In this mode, the taser delivers an electric shock to the victim, but it does not cause an override of the victim's central nervous system as it does in dart-mode." *Mattos,* 661 F.3d at 443. The initial *Brooks* panel found a taser deployed in drive-stun mode to be a lower level of force than one deployed in dart mode *(see Brooks,* 599 F.3d at 1026–28), but, upon en *banc rehearing,* the Ninth Circuit declined to designate drive-stun mode at a specific level of force *(Mattos,* 661 F.3d at 443).

swift. The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless. The tasered person also experiences an excruciating pain that radiates throughout the body.... Beyond the experience of pain, tasers result in "immobilization, disorientation, loss of balance, and weakness," even after the electrical current has ended. *Matta–Ballesteros v. Henman*, 896 F.2d 255, 256 n. 2 (7th Cir.1990); *see also Beaver v. City of Federal Way*, 507 F.Supp.2d 1137, 1144 (W.D.Wash.2007) ("[A]fter being tased, a suspect may be dazed, disoriented, and experience vertigo."). Moreover, tasering a person may result in serious injuries when intense pain and loss of muscle control cause a sudden and uncontrolled fall.

*Bryan*, 630 F.3d at 824–25 (some internal citations omitted). *See also Hickey v. Reeder*, 12 F.3d 754, 757 (8th Cir.1993) (cited by *Bryan*, 630 F.3d at 811–12, 824–25) (stating that a taser "inflicts a painful and frightening blow, which temporarily paralyzes the large muscles of the body, rendering the victim helpless").

The *Bryan* court further found that "[a] reasonable police officer with ... training on the X26 [equal to that of the defendant] would have foreseen these physical injuries [including shattered teeth, facial abrasions, and a barbed probe lodged in the plaintiff's flesh, requiring hospitalization so that a doctor could remove the probe with a scalpel] when confronting a shirtless individual standing on asphalt." *Id.* at 824.

Given these findings, the Ninth Circuit established in *Bryan* that firing an X26 taser at a suspect one time constitutes "an intermediate, significant level of force." *Id.* at 826.[10]

■ An officer's use of a taser is more likely to be unreasonable when the officer deploys the taser more than once.[11] In *Brooks v. City of Seattle*, the Ninth Circuit en banc panel found as an "overwhelmingly salient factor" the fact that the plaintiff was tased in drive-stun mode "three times over the course of less than one minute," as these tasings "in such rapid succession provided no time for [the suspect] to re-

---

**10.** All circuits that have considered the question, including the Ninth Circuit, designate taser use generally as non-lethal or less-than-lethal force. *See Bryan*, 630 F.3d at 825 (citing similar findings from other circuits). There nevertheless have been numerous cases in Ninth Circuit courts in which a suspect died after being tased by police officers, though the connection between the use of force and the suspect's death is a subject of ongoing debate and ambiguity. *See, e.g., Rosa v. Taser Int'l Inc.*, 684 F.3d 941 (9th Cir. 2012); *Marquez v. City of Phoenix*, 693 F.3d 1167 (9th Cir.2012); *Sanders*, 551 F.Supp.2d at 1168; *Neal–Lomax v. Las Vegas Metro. Police Dep't*, 574 F.Supp.2d 1170 (D.Nev.2008); *Heston v. Taser Int'l, Inc.*, 431 Fed.Appx. 586, 589 (9th Cir.2011); *LeBlanc v. City of Los Angeles*, No. 04 CV 8250, 2006 WL 4752614, at *13 (C.D.Cal. Aug. 16, 2006); *Tolosko–Parker v. Cnty. of Sonoma*, Nos. 06 CV 06841, 06 CV 06907, 2009 WL 498099 (N.D.Cal. Feb. 26, 2009); *Salinas v. City of San Jose*, No. 09 CV 04410, 2012 WL 2906052 (N.D.Cal. July 13, 2012); *Gillson v. City of Sparks*, No. 06 CV 00325, 2007 WL 839252 (D.Nev. Mar. 19, 2007); *Teran v. Cnty. of Monterey*, No. 06 CV 06947, 2009 WL 1424470 (N.D.Cal. May 20, 2009).

**11.** Whether the officer fired the taser into the suspect's chest may also affect the intrusion side of the *Graham* balancing. *See Marquez*, No. 08 CV 01132 at 11062 (Schroeder, J., dissenting) ("A recent study published in a journal of the American Heart Association has concluded that a single taser shock to the chest can kill. *See* Douglas P. Zipes, *Sudden Cardiac Arrest and Death Associated with Application of Shocks from a TASER Electronic Control Device*, Circulation, Apr. 30, 2012, at 4 (analyzing the medical records of eight healthy men, seven of whom died after being tased in the chest area, and concluding that shocks from an X26 can cause cardiac arrest).").

cover from the extreme pain she experienced, gather herself, and reconsider her refusal to comply [with the officers' command to exit her automobile]." *Mattos,* 661 F.3d at 445.

## 2. Qualified Immunity Standard

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). A plaintiff need not point to a case specifically on point establishing the official action as unlawful, but he must establish that in light of pre-existing law the unlawfulness of the defendant's actions is apparent. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.*

The Supreme Court recently emphasized the high burden that must be met for a plaintiff to overcome qualified immunity, replacing *Anderson's* language of "*a* reasonable official" with "*every* reasonable official" and stating that "existing precedent must have placed the statutory or constitutional question *beyond debate.*" *Ashcroft v. al-Kidd,* —— U.S. ——, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011) (emphasis added). The Supreme Court has also held that, "in an obvious case, [the *Graham* standards for excessive force] can clearly establish the answer, even without a body of relevant case law" and that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pel-*

zer, 536 U.S. 730, 738, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); *see also Mattos,* 661 F.3d at 442 (quoting *id.*). The Ninth Circuit is "particularly mindful of this principle in the context of Fourth Amendment cases, where the constitutional standard—reasonableness—is always a very fact-specific inquiry." *Mattos,* 661 F.3d at 442. "If qualified immunity provided a shield in all novel factual circumstances, officials would rarely, if ever, be held accountable for their unreasonable violations of the Fourth Amendment." *Id.; see also Deorle,* 272 F.3d at 1286 ("Otherwise, officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct."). *But see Mattos,* 661 F.3d at 453 (Schroeder, J., concurring) ("One could argue that the use of painful, permanently scarring weaponry on non-threatening individuals, who were not trying to escape, should have been known to be excessive by any informed police officer under the long established standards of *Graham.* The Eleventh Circuit has recently held that police officers using a taser were not entitled to qualified immunity where no threat, or escape, was imminent. *Fils v. City of Aventura,* 647 F.3d 1272, 1289, 1292 (11th Cir.2011). Nevertheless, the Supreme Court's opinion in *al-Kidd* appears to require us to hold that because there was no established case law recognizing taser use as excessive in similar circumstances, immunity is required.").

## 1. Whether Defendants' Evidence Shows that Officer Lee Used Reasonable Force

### a. Lee's First Taser Application [12]

Defendants' evidence, uncontradicted by any submission from Plain-

---

**12.** In cases involving multiple taser applica-    tions, district courts often analyze each appli-

tiffs, shows that Lee's force was not unreasonable as a matter of law when he first tased De Contreras.

First, the Court evaluates the "nature and quality of the intrusion" on De Contreras's "Fourth Amendment interests." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. Plaintiffs submit no evidence demonstrating the extent of De Contreras's injury. Defendants' evidence shows that (1) De Contreras suffered a "Taser injury to his chest" requiring a physician's assistant to "remov[e] the Taser darts and administer[ ] the proper wound care" (Ex. N (Manning Declaration); *see also* Ex. O (ARMC Medical Record)); and (2) Lee inflicted pain on De Contreras (*see* Ex. F. (De Contreras Dep.) at 86 ("I was just focusing on the pain that I was experiencing at that time in my chest."); 87 (De Contreras repeated the words "hurt" or "pain" after Lee brought him to the police station); *id.* ("I was all messed up in my body. I could feel it in my heart.").) Additionally, the Court notes the general effects of being tased in dart mode that have been described by the Ninth Circuit, as discussed above. *See Bryan*, 630 F.3d at 824–26; *Mattos*, 661 F.3d at 441, 445. These include effects that are secondary to the taser's primary effect of discharging electricity to incapacitate the suspect, namely, the secondary effects of the barbed darts puncturing the suspect's flesh [13] and the taser shock causing the suspect to collapse to the ground,[14] as observed in the video recording of De Contreras.

Second, the Court weighs this Fourth Amendment intrusion against the government's countervailing interests in tasing De Contreras. Based on the evidence provided, the Court finds all three *Graham* factors to weigh in favor of finding the use of force reasonable: First, a reasonable officer who witnessed De Contreras in a physical altercation with Diaz would have suspected him of committing a violent assault that was ongoing until he noticed the officers' presence. Second, a reasonable officer in Lee's circumstances would have feared that De Contreras had a knife based on the initial 9–1–1 call, would have observed that De Contreras at the moment was agitated and willing to engage in violence, and would have perceived that, at a minimum, De Contreras's physical gestures and movements were potentially threatening. Third, while De Contreras was not physically resisting arrest, a reasonable officer would not have known that he was deaf and would have interpreted his refusal to get on the ground as intentional noncompliance with police orders.

---

cation separately. *See, e.g., Beaver v. City of Federal Way*, 507 F.Supp.2d 1137 (W.D.Wash. 2007); *Sanders*, 551 F.Supp.2d at 1167; *Ciampi v. City of Palo Alto*, 790 F.Supp.2d 1077 (N.D.Cal.2011). The Court finds this analytical method appropriate here in order to apply the law to the precise factual circumstances. Nevertheless, the Court notes that these separate analyses are contained within the overall *Graham* balancing of the totality of the circumstances, which considers, for example, the cumulative effects of the multiple tasings.

13. The *Bryan* court found that "such 'superficial' barbed dart injuries have the potential to be quite significant" and cited government studies indicating the extent of such injuries and the impossibility of predicting how deeply into the skin the darts will embed. *Bryan*, 630 F.3d at 813–14. The court also considered as part of the Fourth Amendment intrusion that the plaintiff "required emergency surgery to have the dart removed." *Id.* at 814–15.

14. *See id.* (citing the head injuries and brain trauma that can result from the muscular incapacitation and stating that tasers can cause "significant injury, especially if the tasered individual, like Bryan, lands on a hard surface. These injuries may even prove fatal, as [the taser manufacturer's] own training materials warn").

### b. Lee's Second Taser Application

Between the first tasing and the second tasing, however, it is less clear whether Defendants' submitted evidence is sufficient such that a reasonable jury could not find Lee's use of force in tasing De Contreras a second time to be unreasonable. With the second tasing, the Fourth Amendment intrusion increased, as more pain was inflicted and De Contreras's state of forced paralysis was prolonged. The incapacitating effects of tasers in dart mode entail unique intrusions into one's bodily integrity that increase with prolonged exposure. In addition to the pain inflicted, tasers in dart mode result in total loss of control over one's own body, immobilization caused not by any external overpowering force, such as a police control hold, but rather by a forced internal separation of the mind and body. The longer a suspect's body is seized in this way, the greater the intrusion into his Fourth Amendment rights must surely be. *Cf. Bryan*, 630 F.3d at 825–26 (internal citations omitted) ("The X26 thus intrudes upon the victim's physiological functions and physical integrity in a way that other non-lethal uses of force do not.... [T]he pain delivered by the X26 is far more intense and is not localized, external, gradual, or within the victim's control. In light of these facts, we agree with the ... characterization of a taser shot as a 'painful and frightening blow.' ")

Inversely, between the first and second tasing, the evidence shows that the countervailing government interest decreased. De Contreras, collapsed on the floor, unable to do more than roll to his side, objectively posed far less of a threat than when he was standing up and moving towards the officers. Further, at this point, a reasonable officer seeing De Contreras roll on the floor, wearing only shorts, would have less fear that De Contreras had a knife on his person or that, even if he did, that he was in a condition allowing him to gain access to and attack with the knife. Most crucially for the "threat" factor, after De Contreras was initially tased, the evidence demonstrates that he was within the officers' control. For 42 seconds, De Contreras was physically incapacitated by the taser charge, attached to Lee's taser through the wired darts as Lee stood either close to him or almost directly above him, and the potential target of Mastaler's drawn firearm. *See LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 961 (9th Cir.2000) ("[T]he use of [non-lethal] weapons ... may be reasonable as a general policy to bring an arrestee under control, but in a situation in which an arrestee surrenders and is rendered helpless, any reasonable officer would know that a continued use of the weapon or a refusal without cause to alleviate its harmful effects constitutes excessive force."); *Headwaters Forest Def. v. Cnty. of Humboldt*, 276 F.3d 1125, 1130 (9th Cir.2002) (emphasis in original) ("Because the officers had control over the protestors it would have been clear to any reasonable officer that it was unnecessary to use pepper spray to bring them under control, and even *less* necessary to *repeatedly* use pepper spray against the protestors when they refused to release from the [restraints]."); *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994) ("[N]o particularized case law is necessary for a deputy to know that excessive force has been used when a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control."); *Hammer v. Gross*, 932 F.2d 842 (9th Cir.1991) (finding officers' force reasonable to place the suspect under control but unreasonable when applied after the suspect was under officer control); *accord Nelson v. City of Davis*, 685 F.3d 867, 884–85 (9th Cir.2012). Thus, as De Contreras may have been under officer control, he may have posed a level of threat to the

officers during those 42 seconds that did not justify the additional use of force.

As to the third *Graham* factor, De Contreras cannot be said to have been resisting arrest during those 42 seconds, as neither officer attempted to place him under arrest. At most, De Contreras was prone, but not completely flat on his stomach as Lee ordered him.

The Court also considers the availability of alternative methods to effectuate the arrest, another salient factor here. *See Smith v. City of Hemet*, 394 F.3d 689, 701–02 (9th Cir.2005) (en banc); *Headwaters Forest Defense*, 240 F.3d at 1204 ("[P]olice are required to consider what other tactics if any were available to effect the arrest."). Lee was not required to "use the least intrusive means available" to arrest De Contreras (*Luchtel v. Hagemann*, 623 F.3d 975, 982 (9th Cir.2010)), but a reasonable jury might find that, at some point during those 42 seconds, either officer could have placed De Contreras in handcuffs with very little risk to their safety, thus negating the need to expose De Contreras to another taser shock.

Similarly, tasing De Contreras again 42 seconds after the first tasing may in fact have impeded the countervailing governmental interest by ultimately delaying the arrest. That is, waiting 42 seconds and then tasing De Conteras again may have increased the Fourth Amendment intrusion *and* decreased the efficacy of the use of force as compared to the available alternative: immediately handcuffing and arresting De Contreras after the first tasing, when, as demonstrated in the video recording, De Contreras was unable to do more than roll on the ground and at various points was face-down on the floor. Like in *Brooks*, both sides of the *Graham* balance may have shifted toward a finding of unreasonableness when Lee, by discharging his taser a second time, provided De Contreras "no time ... to recover from

the extreme pain [he] experienced, gather [him]self, and reconsider [his] refusal to comply." *Mattos*, 661 F.3d at 441.

### c. Totality of the Circumstances

Determining whether a reasonable jury could find that the totality of the circumstances did not justify Lee's use of force is complicated by the lack of clear precedent regarding police use of tasers, particularly with respect to the reasonableness of deploying the taser more than once. Thus, before assessing the factors discussed above and determining whether, in light of the totality of the circumstances, a jury could reasonably find that the use of force was unreasonable, the Court turns to the question of qualified immunity.

### 2. Qualified Immunity for Officer Lee

█ The incident at issue here occurred in August 2010, before the Ninth Circuit's final decisions in *Bryan, Brooks*, or *Mattos*, the cases providing the most extensive and recent guidance on tasers as a use of force. Hence, the Court finds that Lee is entitled to qualified immunity because the law regarding a second application of a taser, after a first application that was objectively reasonable, was not then clearly established.

Specifically, it was not clearly established how firing a taser at a threatening suspect affects the degree of threat that every reasonable officer would perceive after that first tasing. In fact, despite the many ways in which multiple tasings, particularly in the incapacitating dart mode, would appear to shift the *Graham* balance to weigh against reasonableness, the Ninth Circuit has given this factor only brief consideration. For example, in *Sanders v. City of Fresno*, the Ninth Circuit affirmed summary judgment for officers who tased an unarmed suspect five times in dart mode and five times in drive-stun mode, exposing him to taser shocks for up to

seventy seconds total, leading to his death. 551 F.Supp.2d at 1158–60. The district court noted that, of the precedent cases "involving multiple Taser applications, each case found no constitutional violation." *Id.* at 1164. In *Beaver v. City of Federal Way,* the district court stated, "After reviewing the case law, the Court concludes that in 2004, when [the plaintiff] was arrested, the contours of Fourth Amendment jurisprudence and, in particular, excessive force claims of this type, were not sufficiently clear that a reasonable officer would have understood that multiple tasings of [the plaintiff] under these circumstances violated his rights." 507 F.Supp.2d at 1148. Regarding the reasonableness of multiple tasings, there has been little clarification of the law since 2004. Of the more recent Ninth Circuit cases, only *Brooks* concerned multiple taser applications, and that was in the context of a taser in drive-stun mode. *See Mattos,* 661 F.3d at 445.

As the applicable law regarding the reasonableness of Lee's use of force was not clearly established at the time of the injury, Officer Lee is qualifiedly immune.

In light of this finding, the Court declines to determine whether a jury could find reasonably that Lee violated De Contreras's Fourth Amendment rights. Therefore, the Court grants summary judgment in favor of Defendant Lee on De Contreras's Fourth Amendment claim.

## B. De Contreras's Fourteenth Amendment Claim Against Lee and Mastaler for Fabricating Police Reports

■ The record lacks any evidence to support Plaintiffs' claim that Lee or Mastaler fabricated their police reports. Furthermore, as De Contreras was convicted on the charges alleged in the police reports (*see* April 9, 2012 Minute Order Granting Motion to Dismiss at 7 (Doc. No. 42)), he cannot now challenge the validity of those police reports under 42 U.S.C. § 1983. *See Heck v. Humphrey,* 512 U.S. 477, 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) (holding that a claim for damages that would invalidate a conviction or sentence that has not already been invalidated or reversed on direct appeal, by executive order, by an authorized state tribunal, or by a writ of habeas corpus is not cognizable under § 1983.) Thus, Defendants are entitled to summary judgment on De Contreras's Fourteenth Amendment claim.

## C. Plaintiffs' Rehabilitation Act and ADA Claims Against the City

■ Plaintiffs allege that the City violated their rights under section 504 of the Rehabilitation Act of 1973, which provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a). To state a claim under Section 504, Plaintiffs must show that (1) they are individuals with a disability; (2) they are otherwise qualified to receive the benefit; (3) they were denied the benefits of the program solely by reason of their disability; and (4) the program receives federal financial assistance. *Weinreich v. L.A. Cnty. Metro. Transp. Auth.,* 114 F.3d 976, 978 (9th Cir.1997).

■ In his Declaration, Chief of the Rialto Police Department William Farrar declares that the City "does not receive the federal funding necessary to trigger the application of the Rehabilitation Act." (Ex. T ¶ 12). While the Court need not accept—and in fact doubts—Farrar's legal conclusion, there is no evidence before the Court that would allow a reasonable jury to find that the Rialto Police Department receives the public funding to make it bound by the Rehabilitation Act with re-

spect to Plaintiffs' allegations. Furthermore, the evidence demonstrates that Mastaler effectively communicated with the witnesses after he learned they were deaf, and that neither Lee nor Mastaler knew that De Contreras was deaf until after he was placed under arrest. Thus, because there is no evidence submitted that could satisfy the third or fourth elements of Section 504, Defendants are entitled to summary judgment on Plaintiffs' Rehabilitation Act claim.

■ To state a claim under Title II of the ADA, Plaintiffs must show that (1) they are qualified individuals with a disability; (2) they were either excluded from participation in or denied the benefits of a public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of their disability. *Weinreich,* 114 F.3d at 978.

[30] As "[t]here is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act," the Court analyzes these claims simultaneously. *Zukle v. Regents of Univ. of Cal.,* 166 F.3d 1041, 1045 (9th Cir.1999). Thus, because no evidence before the Court shows that Plaintiffs were denied any benefit covered by the ADA or Rehabilitation Act, Defendants are entitled to summary judgment on Plaintiffs' ADA and Rehabilitation Act claims.

**D. Plaintiffs' State Law Claims for Abuse of Process, General Negligence, and Negligent Supervision and Hiring [15]**

A district court may decline to exercise supplemental jurisdiction over a state claim if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "The Supreme Court has stated, and we have often repeated, that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Acri v. Varian Associates, Inc.,* 114 F.3d 999, 1001 (9th Cir.1997) (quoting *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)).

■ After considering the jurisdictional principles of judicial economy, procedural convenience, fairness to litigants, and comity, the Court finds it appropriate to decline supplemental jurisdictional over Plaintiffs' remaining state law claims. *See id.* at 343, 108 S.Ct. 614.

## V. CONCLUSION

For the foregoing reasons, the Court GRANTS summary judgment in favor of Defendants on Plaintiffs' federal law claims and DISMISSES WITHOUT PREJUDICE to refiling in state court Plaintiffs' remaining claims.

---

**15.** Plaintiffs' negligence claims are pled under state law standards and Plaintiffs do not allege facts sufficient to state a claim under federal law. *Cf. Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Bd. of Cnty. Com'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *City of Canton, Ohio v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).